Good morning, Your Honors. May it please the Court, Jonathan Libby appearing on behalf of the appellant, Ami Kaul. Unless the Court has any objection, I'd like to first address the number of victims enhancement issue and then come back to the loss calculation issues. My first argument, then, is that the two-level enhancement for more than 10 but less than 50 victims was, in fact, improper here because there were only eight identified victims. The guidelines define victims as persons who sustained actual loss or, in the stolen mail context, persons who were the intended recipient or addressee of undelivered United States mail. In this case, we had eight identified victims of the credit card companies, the financial companies that suffered actual loss. The district court here then found that there were at least two pieces of mail that had been stolen. There are a couple of problems with that. First, there was no evidence submitted as to whether or not any of the mail had been, in fact, stolen. We don't know if the mail was stolen. Except the defendant's statement. Well, the defendant indicated that he took information from the trash and that he And from mailboxes. And from mailboxes at various departments. He also said that he took it from unlocked mailboxes and from mail that was on top of mailboxes. It's not clear whether or not this is mail that, in fact, had just simply been discarded. But given the facts and given those statements, why, when the district court says, but we do know we have eight victims with regard to the cards that were found, and the court thinks it's reasonably likely that as to the other mail in the defendant's possession, at least two pieces came from the mail and not from the trash. That's irrational, not supported, clearly erroneous. First, there was no evidence introduced by the government to support the fact that this was two pieces of mail that were stolen. Yeah, but he said mailboxes, plural, and you only need two to get to 10. So why isn't that enough? And he didn't go to 50. Well, two problems. First, in fact, for this enhancement, you needed to get beyond 10. The guidelines that are in effect now, you only need to get to 10. But the guidelines that were applied in this case, there had to be more than 10. So the victims could get to the more than 10. Well, then there's Wu. Beg your pardon? Wu. Mr. Wu. What about Mr. Wu, Your Honor? Well, he's identified, and he was a victim of mail theft. That brings, that's one identified victim. Well, plus the other two. Well, but Your Honor, the district court did not in fact state that. And in addition to that, the fact that there were two pieces of mail does not necessarily establish that there were two victims. If the two pieces of mail came from the same individual, then in fact there was only one victim. So we in fact don't know, and it was certainly not established, that there were more than 10 victims here. The government could have introduced evidence perhaps if they had it, but they for some reason chose not to. So we would submit that there simply is not sufficient evidence to support the enhancement here. Now, if I could turn to the intended loss issues. First, the district court found, decided to apply the face value of the 12 canceled and uncashed checks that were found in Mr. Call's apartment. We would submit this, first, this was not relevant conduct. Mr. Call was charged with credit card fraud. There's no evidence whatsoever that he ever deposited any checks, that he ever had any plans to deposit any checks. He never watched any checks. The government relies on the fact that he had some checking accounts that he could have deposited these checks into. But all of us have checking accounts we could deposit checks into. That doesn't necessarily mean he was going to do that. There was simply no evidence that he had any, anything to do with any type of check fraud. And the largest check here, which was for nearly $50,000, we're dealing with a check that I think was clearly discarded, that he clearly took out of the trash. It's a canceled check from 1995, made payable to the IRS, which was staple to someone's tax return. I mean, clearly this was something that was in someone's file and they had discarded it. This is not something that was taken from the mail. This was not a realistic economic approach to calculating loss. The total here was nearly $71,000 in loss based on checks that had no relationship to Mr. Waller's loss. Well, even if you get rid of the Kenney check, you're left with, what, $25,000? If we get rid of the Kenney check, it's about $14,000. Well, I'm sorry, $12,767, okay, for checks. Beg your pardon? In checks. That's correct. Again, I mean, our position is that none of the checks should count. I understand. But if they do count, and if you disregard the Kenney check, you've still got $12,000 that you agree is actual. If you would count those checks, yes, then that would, yes, if you took that out. Of course, several of the other checks were also very old, just as the Kenney check. And, you know, so it's not at all clear that this was an appropriate basis for the district court to calculate loss. Where did these checks come from? Well, Mr. Call indicated that he took various pieces of mail from mailbox areas and from the trash. It's not clear, in fact, where these particular checks came from. They were part of 198 items that were found in his apartment. Did he take grocery receipts and credit card mailings and coupons for discount purchases and other stuff? Well, I mean, it seems to me that for some reason he selected these things that weren't his and accumulated them in where, in his house, in his dwelling? They were found scattered amongst his, in his house, yes. The 198 pieces of credit cards, of credit reports, of things that he had. So he took the checks from the same place that he took the other things that he's charged with? Presumably. I mean, it's not entirely clear where he got these particular checks. And given all the other options he had, including not take stuff that he never intended to do anything with, it seems that that would support the district court's view that this is related stuff, somebody else's monetary instruments. Well, but, Your Honor, these were checks, and his crime is credit card fraud. All he's ever done is credit card fraud. The only evidence in this case that he stole these checks from the trash and from mailboxes. Well, Your Honor, with respect, as I said, with respect to the Kenny check, this was clearly a discarded. This was in the trash. There's no crime. But Kenny was. Right. Kenny was. And perhaps the others were as well. Perhaps. We don't know. And it was the Congress court that proved that, in fact, this, in fact, took place. Why did he have these? Your Honor, he took stuff from mailboxes and from the trash, and presumably did not then throw things away. He accumulated stuff. This was scattered throughout his apartment. Unlike the last case, where it was apparently in alphabetical order and all neat, and, you know, he had these plans, you know, Mr. Call just had, you know, piles of junk, I mean, mail and other items that, you know, I mean, he just had no intent to deposit any of these checks. There was not any checks. What was he going to take them to a check convention? Beg your pardon? Was he going to take them to a check convention or something? He was collecting them? No, I don't know what he planned to do with them. He certainly had never deposited any checks in the past. I mean, he had a great deal of credit card fraud here. That's clear. But never anything with checks.  No, Your Honor. All right. Now, the district court, perhaps recognizing that this was not the best way to determine loss, then came up with some alternative loss calculations, which is counting the actual credit card numbers that were involved in this case at $500 per, which is the minimum number. The problem with that calculation with respect to the credit card numbers is it included incomplete and partial numbers, which are not account numbers. They're just a meaningless list of numbers. There's no way to use them to gain access to anything. Apparently, Mr. Cole thought so because he had notes scribbled on. Thought so, didn't he? Well, he had notes scribbled on various credit reports. That's correct. But not that clearly cleared up what the missing numbers were. I mean, we're talking about if it's missing four numbers, I mean, we're talking about millions of combinations of numbers. It's just it's not an account number. And the government said that if you take out the partial and incomplete numbers, then they're down to 50. So what Judge Snyder did was she calculated 75. Our argument would be, in fact, it should only be 50. That should have been counted at 500 per. Judge Snyder also then added on 37 social security numbers. No court has ever found a social security number to be an access device. And our position is a social security number is a means of identification. And if you look at the definitions for access devices, Congress could have included social security numbers in the definition of an access device. It did not. In defining the means of identification, it included social security numbers and access devices. It's distinguished between the two. So I believe Congress clearly intended that social security numbers were not access devices. And it was improper to count those 37 numbers in the calculation. Unless the court has any further questions. No, thank you, counsel. Thank you. We'll hear from the government. Good morning, your honors. May it please the court. Bruce Serby appearing on behalf of the United States. I'd like to say that all the issues in this case relate to giving the proper scope to the concept of relevant conduct under the sentencing guidelines. And here the defense suggests an unduly cramped and restricted version of what relevant conduct is. And the government, citing authority, seeks to give as much relevance to the criminal activity that was discovered when the defense department was searched and when he was searched on the train in Albuquerque. Now, getting right to the check issue, I'd like to make clear, defense counsel in his briefs and today has repeatedly stated that Mr. Cowell certainly never washed or deposited checks. There's actually no evidence in the record, either way, as to whether he deposited or didn't deposit any of these checks that he took from people. Does that help you? No, it doesn't help me, your honor. But the evidence was not developed either way at the district court. But I want to make clear that in the face of defense counsel's protestations that, in fact, Mr. Cowell never deposited checks, there's no evidence in the record for that prophecy. I don't really understand how that helps you, though. Because, I mean, his argument, as I understand it, really is that this guy had a bunch of trash around. He never intended to use checks. And the government is improperly counting the checks to prove relevant conduct that's not based on anything in the record. So tell me how the record helped on that issue. Yes, your honor. As far as evidence of intent to misuse these checks, the government has pointed to various facts that the district court presumably relied on. First of all, the defendant's possession of these checks was at the exact same time and place as his possession of the unauthorized access devices that are indisputably part of this common plan or scheme, this relevant conduct. So it's in the same cache of financial instruments that the defendant was busily exploiting at the time that he was arrested, the second time. That leads to an inference that he possessed these instruments also in an attempt to exploit them. The defendant had opened checking accounts to which he could have deposited these checks. But not just any checking accounts, checking accounts in these fictitious aliases, if you will. Finally, there's a lot of other checking account information that's in the record that the defendant accumulated that, again, supports the inference that he had an intent to misuse these checks, to deposit these checks, to make some use of these checks. And the defendant has never offered an alternate explanation of why he possessed these checks or what he intended to do with them in the face of the government's prima facie showing that there is, there was some intent for him to use these checks. If you take out the checks, how much, how much difference does it make in the sentence? There, of course, was an alternate loss calculation by the court. So if you were to take the checks out, you'd have to move to the next issue, which are the additional credit card numbers and the Social Security numbers. No, that's not my question. My question is, if you, I just wanted a factual answer, do you know? $70,000, Your Honor, I believe that the amount that was attributed to the completed checks was $70,000. So if you don't, if you don't go to the alternate issue, how much difference does it make in the sentence? Do you know? I believe it makes two levels of the sentence. Okay, thanks. You've said in your brief as to the largest of the checks, the defendant had compiled by the time of his arrest a dossier on the Kenney couple. That's correct. On which the district court could have reasonably drawn the inference that the defendant was preparing to try to, preparing to try to cash the check. Elaborate, what do you mean he had a dossier on the Kenney couple? And you could draw inferences that that was going to be used in some way in connection with the check? Yes, Your Honor. The defendant had a credit, had credit bureau reports for each of the Kenneys. Those credit bureau reports gave their addresses and the various accounts they held. Other access devices that the Kenneys had, the account numbers for those. The, I believe, if I'm not mistaken, that the Kenneys were some of the credit reports that were heavily marked up with notations by the defendant. If you look at, if you look at the government's citation to the record, as far as the Kenney checks go, it, and I have excerpts of record 147 and 148, which you have here. I'm sorry, Your Honor. That's, that's actually the spreadsheet. Direct your attention to 248. That's the check. Your Honor, the, in the record, in the access device, part of Exhibit E to the government sentencing memorandum, the government filed Exhibit E that actually provided all the documents relating to the credit card numbers and access device numbers. Within Exhibit E, the Kenneys have a number of pages, several pages, which consist of credit bureau reports and other documentation, much of it heavily marked up, that indicate that they were a focus of defendants' efforts to commit wrongdoing. Focus with respect to what kind of wrongdoing? Credit card wrongdoing or check wrongdoing? Both, Your Honor. And, and certainly the, the marginalia in the credit bureau reports indicates that the defendant was, was studiously looking at how to exploit the financial documentation he had. What did the marginalia say? The marginalia include credit balances, as I recall, credit balances. I'm actually looking at excerpts of Record 203, which is where the marginalia is. The marginalia include John Kenney's social security number. It includes a password, his date of birth, his address, the credit limits for his credit cards, and high balance information. Excuse me? High balance. High balance in what? In other words, how, how high the balance in the credit card account had been. Credit card account. That's correct, Your Honor. And so there, he, if you look over the pages beginning at excerpts of Record 203, you really see to what extent the defendant had gone to town on this financial information for the Kenneys. And I think that that's very important and, and whether or not this court should find clear error in the district court's finding that this check was part of some intent by the defendant to, to exploit and defraud the Kenneys. And that is the standard. It's clear error. So while the government is, is, is inducing circumstantial evidence as to the intended use of this check, and we can see that there, it presented no evidence that a check was actually deposited and negotiated by the defendant. It is circumstantial evidence that the district court found compelling enough to make this finding and that this court needs to find was clearly erroneous. What's your best case that a social security number is an access, is considered to be an access device? The, the plain meaning of the words personal identification number. How do you deal with the argument then that Congress identifies in the disjunctive social security number or other access device in a separate statute and therefore seem to indicate that there were two different things? Well, I have a problem with, with drawing that inferences to congressional intent. As the court is aware, congressional intent is rarely that clear to begin with. And then to be attempting to draw congressional intent, intent from statutes that were in separately enacted and draw the inference that because a particular item was mentioned in one statute, but not in the other, that therefore the other statute did not comprehend with the other statute. Within its terms, the item, I think. Well, that is a principle of statutory construction, whether you like it or not. I mean, you, you're arguing, if I understand your argument, you're just arguing from the plain language of 1029E, right? I am, Your Honor, but I'm also, I'm also arguing from case law, which, which in the context of 1029E1 shows that, that Congress did not mean to enumerate all the possible incarnations of an access device. And the courts have recognized that validated airline tickets and blank credit cards, although not specifically enumerated and stated within 1029E1, also fit within the plain language of those terms that are set forth in that statute. Is it true that, I mean, I think it's true that there's no case yet that says a social security number fits within the definition? As of last night, Your Honor, there was not. Hopefully as of tomorrow, there will be. How do you get from 8 to 10 or more than 10? Quite simply, I think it's at this point, it appears to be conceded that you, you can aggregate the number of victims of actual credit card losses, namely the credit card companies, with however many victims can be proven that were victims of mail theft. Here, the record clearly states, in the defendant's own words, that I got some information from the trash and from mailboxes at an apartment in the Westwood area. The mail came from boxes that were unlocked or were placed on top of mailboxes. So we have multiple boxes that were unlocked, and I don't care whether they're locked or not, it's still stealing from a mailbox. You don't have to lock your box in order to have a property interest in someone not going in and taking your mail out of there. So we have multiple boxes from which the tenant admits he put his hand in and took mail. Now, is it clear error for the court to say, well, you know, I think that multiple mailboxes means multiple victims. I don't think so. I don't think you have to say it's clear error for the court to have made that inference. And to say, well, it's entirely likely this could have all come from one victim, one victim with multiple mailboxes. There were over 100 names of people whose identity information the defendant took in this case. Is it clear error for the district court to say, especially when the defendant admitted to robbing mail from multiple mailboxes, that three people, three people were victims of mail theft in this case? I don't think that's clear error. It's not any kind of error, frankly. I think that the district court was very much entitled to draw the inference that there were at least three victims of mail theft from the defendant's own words. And there's no requirement that the names of the individuals be specified. Where did the district court infer at least three? Well, that is, by applying the enhancement for more than 10 victims, I think that the district court had to infer that there were at least three. Well, isn't it equally possible that the district court made a mistake? Because the district court said, we know we have eight. The court thinks it's reasonably likely that as to the other mail in the defendant's possession, at least two pieces of that mail came from the mail and not from trash. There's 10. Your Honor. That's why I asked, where do you get three? I don't see the district court ever saying three. The district court says two, getting it to 10. Your Honor, I believe that the district court did make that finding, as you stated. And what I would urge the court to do is to affirm based upon any ground that can be found in the record. And in this case, there is ample evidence in the record of at least three victims of mail theft. Yeah, I mean, it's a problem for us to draw an inference then that the district court didn't draw. I mean, this is inferential. There's no direct proof. And it may be a fair inference. But I think your argument was there's no clear error in this finding. And there is no finding that says that, right? Yes, Your Honor. The statement is eight plus two is 10. It could be that the district court wasn't being clear or misstated its choice of words and said at least two when it meant more than two. Yeah, but see, here's the problem is that you start off by saying there's no clear error in the finding. And then you're asking us to make a de novo finding because the district court didn't get the first finding right. Right? I mean, that's basically where we are. I wouldn't call it a de novo finding. I'd call it the court has a well-established ability to affirm based upon any grounds that are in the record. It appears to me that the court may have made a mistake of law and thought that 10 was enough. Setting aside whether the two is rational, you only get to 10. All I could find was 10. Your Honor, that is very much of a possibility that along with the other possibility that it was just a poor choice of words. Okay. Thank you. Thank you, counsel. If you have anything you'd like to say in response, very briefly, we've got your points. Your Honor, I'll just state with respect to all of the information that was on the so-called canny dossier, identity theft was already taken into account here with the breeding enhancements. The checks here were a means of identification that were used to obtain other information. That's exactly what the breeding enhancement was intended to cover, and that was applied here. And just with respect to the social security numbers, while 1020, the definition for access devices is to be broadly interpreted, that is so that it can take into account various technological advances. The social security number is certainly not a technological advance, and Congress certainly could have, if it meant to include it under the definition of access devices, it could have done so. A personal identification number, if you look at the congressional history, and we cite to it in our brief, the congressional history shows that personal identification number in the definition is meant to mean a pin that you use with an ATM card or a credit card to withdraw money from a telling machine. It was not meant to include a social security number. Thank you, counsel. This case is ordered and submitted. We'll call the United States v. Julio Cortez Rocha.
judges: Trott, Rymer, Thomas